IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Laurine Stevenson,<br><br>　　　　　　　Plaintiff,<br><br>　vs.<br><br>Carolyn W. Colvin, Acting<br>Commissioner of Social Security,<br><br>　　　　　　　Defendant. | Civil Action No. 6:15-2062-TMC-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

　　　　　This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).

　　　　　The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits under Title II of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

　　　　　Prior to this application for disability insurance benefits ("DIB"), the claimant filed applications on April 29, 2009, and November 2, 2010. These applications were denied at the initial level, and there was no appeal. The plaintiff filed the current DIB application on October 4, 2011, alleging that she became unable to work on March 15, 2007. The application was denied initially and on reconsideration by the Social Security Administration. On June 18, 2012, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Leanna L. Hollenbeck, an impartial vocational expert, appeared at a hearing on October 24, 2013, considered the case *de novo* and, on

February 3, 2014, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended.   The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on March 23, 2015.  The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

(1)  The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.

(2)  The claimant did not engage in substantial gainful activity during the period from her alleged onset date of March 15, 2007, through her date last insured of December 31, 2011 (20 C.F.R. § 404.1571 *et seq*).

(3)   Through the date last insured, the claimant has the following severe impairments:  pancreatitis, systemic lupus erythematosus, and a depressive disorder with anxiety (20 C.F.R. § 404.1520(c)).

(4)  Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).

(5)   After careful consideration of the entire record, the undersigned finds that through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 C.F.R § 404.1567(a) except with simple routine repetitive tasks and frequent but not constant handling and fingering.

(6)  Through the date last insured, the claimant was unable to perform any past relevant work (20 C.F.R. § 404.1565).

(7)  The claimant was born on August 3, 1963, and was 48 years old, which is defined as a younger individual age 45-49, on the date last insured (20 C.F.R. § 404.1563).

(8)  The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 404.1564).

(9)    Transferability of job skills is not material to the determination of disability because the Medical-Vocational Rules support a finding that the claimant is "not disabled," whether or not claimant has transferable job skills (*See* SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(10)  Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that claimant could have performed (20 C.F.R. § 404.1569 and 404.1569(a)).

(11)  The claimant was not under a disability, as defined in the Social Security Act, from March 15, 2007, the alleged onset date, through December 31, 2011, the date last insured (20 C.F.R. § 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## **APPLICABLE LAW**

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2)  has a severe impairment, (3)  has an impairment that equals an illness contained in the Social Security Administration's Official Listings of

3

Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. § 404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments that prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a

4

preponderance.  If there is evidence to justify a refusal to direct
a  verdict were the case before a jury, then there is "substantial
evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational.  *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was 43 years old on her alleged disability onset date (March 15, 2007) and 48 years old her date last insured (December 31, 2011).  She has a high school education and past relevant work experience as a sales attendant, hand packager, and cook/baker's helper (Tr. 22, 49).

The plaintiff has a history of treatment for chronic pancreatitis (inflammation of the pancreas) (Tr. 316-767, 1104-44, 1378-1427).  In July 2006, eight months before her alleged disability onset date, the plaintiff was hospitalized for abdominal pain due to acute gastritis (inflammation of the lining of the stomach) and probably secondary to recurrent pancreatitis (Tr. 312-767).  The attending physician, Darlington Hart, M.D., indicated that the plaintiff was known to him and had a history of "questionable 'scrum negative' lupus" and of recurrent pancreatitis for which she had been admitted to the hospital multiple times (Tr. 662).  A CT scan of the abdomen in July 2006 was unremarkable with no evidence of acute pancreatitis (Tr. 711).  Upon discharge, Dr. Hart formed an impression of "acute gastritis with abdominal pain probably secondary to recurrent pancreatitis but so far there is no evidence of pancreatitis based on her labs and her CAT scan" (Tr. 647).

5

On March 20, 2007, Randolph L. Rodrigue, M.D., of Digestive Disease Associates of York County, P.A., evaluated the plaintiff for vomiting and abdominal pain. He noted that she had been treated in the emergency room recently, but had chronic problems for years. Dr. Rodrigue prescribed Praceas and Nexium and advised that the plaintiff try to get off of steroids (Tr. 1384). Dr. Rodrigue reevaluated the plaintiff on July 25, 2007. He indicated the plaintiff had abdominal pain and pancreatitis of unknown cause for a number of years, but had begun having diarrhea after she eats as well. The plaintiff's stool studies were negative. Dr. Rodrigue noted that the plaintiff weighed 182 pounds. He diagnosed probable post-cholecystectomy diarrhea and prescribed Questram and Aciphex. He also continued the plaintiff's prescription for Ultram (Tr. 1386). On July 26, 2007, Dr. Rodrigue indicated that the plaintiff had chronic abdominal pain and carried a diagnosis of lupus treated with prednisone chronically. He indicated that the prednisone aggravated her GI problems and he would like her to go off of the prednisone from a long-term health standpoint (Tr. 1389). A CT scan of the abdomen in July 2007 was normal (Tr. 1113-14).

On August 15, 2007, Dr. Rodrigue indicated that the plaintiff continued to have chronic abdominal pain and diarrhea. A 72 hour stool collection was ordered (Tr. 1385). On August 29, 2007, the plaintiff had a cystoscopy with transurethral collagen installation for stress urinary incontinence (Tr. 593-646).

The plaintiff was hospitalized from October 1-3, 2007, for chronic pancreatitis with ongoing nausea, some vomiting, diarrhea, and abdominal pain (Tr. 1390-93).

On December 29, 2007, Dr. Rodrigue evaluated the plaintiff for continued abdominal pain with occasional diarrhea. He prescribed Vicodin and continued the plaintiff's other medications (Tr. 1394). A CT scan of the abdomen on January 7, 2008, showed no acute abdominal abnormalities (Tr. 1124).

On February 7, 2008, the plaintiff was hospitalized briefly for profuse vomiting and diarrhea (Tr. 1127-1228).

6

On February 28, 2008, Dr. Rodrigue evaluated the plaintiff for diarrhea, abdominal pain, and gas.  He felt that some of the plaintiff's symptoms were from lactose intolerance and that she needed to better follow a lactose free diet (Tr. 1398).  On June 7, 2008, the plaintiff complained of diffuse abdominal pain and Dr. Rodrigue started her on a trial of Bentyl (Tr. 1399-1400).

On August 19, 2008, the plaintiff continued to have diffuse abdominal pain. Her symptoms included abdominal bloating, abdominal cramping, abdominal pain, lactose intolerance, nausea, vomiting, and weight loss.  Dr. Rodrigue ordered diagnostic tests (Tr. 1403-04).

On September 8, 2008, due to continued abdominal pain and nausea, Dr. Rodrigue advised hospitalization (Tr. 1405-06).  The plaintiff was hospitalized from September 9-11, 2008, for abdominal pain.  It was noted that the plaintiff had chronic pancreatitis and had mild pancreatitis on endoscopic ultrasound.  The plaintiff reported intermittent nausea and vomiting with intractable diarrhea.  Dr. Rodrigue indicated that the plaintiff had a history of chronic abdominal pain for more than 20 years with a questionable history of pancreatitis (Tr. 578). Dr. Rodrigue noted that the plaintiff was a poor historian and prone to exaggeration, and, therefore, he wanted to see just how much diarrhea the plaintiff actually had on observation in the hospital (Tr. 579).  Dr. Rodrigue put the plaintiff on a lactose free diet, and she had no diarrhea in the hospital, which he felt confirmed his suspicion that lactose intolerance was causing the diarrhea (Tr. 574).  He noted that a CT scan in August had been negative, and two obstruction series, an upper GI, and a small bowel follow-through had all been negative.  The plaintiff did vomit while in the hospital, which Dr. Rodrigue felt caused by "Addisonian-type withdrawal "related to her being on chronic low-dose steroids.  The plaintiff was placed on 20 milligrams of prednisone per day and was counseled that she could not stop steroids suddenly.  Dr. Rodrigue noted that he did not think the plaintiff was aware of this and seemed to have been very noncompliant

7

with her steroids at home based upon his questioning (Tr. 575). She was stabilized and discharged with prescriptions for Lortab and prednisone (Tr. 574-86).

On September 13, 2008, the plaintiff was treated in the emergency room for moderate to severe abdominal pain with nausea and loss of appetite. She was discharged with prescriptions for Levsin, Phenergan, and tramadol (Tr. 570-72, 587-92).

On February 17, 2009, the plaintiff was treated in the emergency room for severe increased abdominal pain, nausea, and dizziness. She appeared to be in mild distress. It was noted that she had a history of pancreatitis, anxiety, and systemic lupus erythematosus. The plaintiff was given IV Dilaudid and Phenergan (Tr. 554-68).

On February 23, 2009, the plaintiff was treated in the emergency room for weakness, syncope, and collapse. The cause of her fainting was undetermined and she was advised to follow-up with her primary care provider (Tr. 532-51).

The plaintiff reported abdominal pain in March 2009, but a CT scan of the abdomen and pelvis showed no acute abnormalities (Tr. 309). A CT of the abdomen and pelvis in June 2009 also showed no acute abnormalities (Tr. 308).

On June 19, 2009, the plaintiff was treated in the emergency room for chest pain and back pain. She also reported that her fingers were turning a bluish color and tingling. She was diagnosed with chest pain and advised to seek follow-up treatment (Tr. 508-31).

On January 28, 2010, the plaintiff sought emergency room treatment for severe abdominal pain of one day duration. She rated her pain at a nine out of ten with some nausea (Tr. 489-90). A CT scan of the abdomen was essentially unremarkable, there was no evidence of pancreatitis, her pain appeared to be epigastric, and she was treated with morphine and Toradol for pain. The plaintiff was discharged with instructions to see her gastroenterologist the following day and prescribed Percocet (Tr. 489-507).

On January 29, 2010, Robert Schmitz, M.D., of Charlotte Gastroenterology & Hepatology, evaluated the plaintiff for pancreatitis and stomach problems. Dr. Schmitz noted that the plaintiff had a long history of pancreatitis with recurrent hospitalizations in the last year. The plaintiff reported having a cholecystectomy in the mid-1980s and several ERCPs with pancreatic stents. The plaintiff complained of recurring epigastric discomfort and recent emergency room visits. Dr. Schmitz indicated that the plaintiff had a history of systemic lupus treated with active steroid use. Dr. Schmitz diagnosed acute dyspepsia, history of chronic pancreatitis, systemic lupus, and constipation. He ordered blood work, strongly advised treatment with a pain management specialist, and started the plaintiff on Miralax and omeprazole (Tr. 921-23).

On February 12, 2010, Michael B. Denenberg, M.D., a pulmonologist, initially evaluated the plaintiff for complaints of shortness of breath and left posterior chest pressure for two to three months. Dr. Denenberg noted that the plaintiff was sent for evaluation of a pulmonary nodule, but he did not have her CT scan available to make comment. Dr. Denenberg noted the plaintiff's history of hypertension, left-sided hearing loss, recurrent pancreatitis, gastroesophageal reflux disease, recurrent urinary tract infections, and bladder issues. The plaintiff admitted to occasional wheezing, which was worse in the morning; occasional nocturnal symptoms, which awaken her at night; and worsening of her breathing with exposure to change in weather, dust, perfumes, chemical fumes, cigarette smoke, and exercise. He indicated that the plaintiff's spirometry showed a severe obstructive defect but was a poor technique. He started the plaintiff on Advair and indicated that he would order a repeat CT scan (Tr. 272-74).

On February 20, 2010, Dr. Schmitz evaluated the plaintiff for chronic abdominal pain, diarrhea, and rectal bleeding. He noted that the plaintiff had restarted pancreatic enzyme replacement and omeprazole. Dr. Schmitz also noted that the plaintiff was on methadone and Darvocet for chronic pain. Dr. Schmitz indicated that the plaintiff

9

had mild tenderness in her right lower abdominal quadrant with guarding.  He diagnosed chronic abdominal pain, history of chronic pancreatic, narcotic induced constipation, loose stools, and episodic rectal bleeding.  He refilled her medications and recommended that she reestablish care with a pain management specialist since his office could not prescribe narcotic medications (Tr. 918-20).

An examination on February 22, 2010, showed that the plaintiff had normal range of motion of her cervical and lumbar spine, and hips, with no pain or tenderness and normal motor strength (Tr. 244-53)

On February 26, 2010, Dr. Denenberg evaluated the plaintiff for mild left-sided tightness in her chest radiating to her left arm pit associated with lightheadedness and diaphoresis.  Dr. Denenberg noted that the etiology of the plaintiff's symptoms was unclear and he ordered additional diagnostic testing (Tr. 271).  On March 25, 2010, Matt Kyer, Dr. Denenberg's physician assistant, evaluated the plaintiff.  He noted that she had an overnight oximetry on room air and desaturated below 90% for 0.5% of the night in a pattern that could be suggestive of sleep disordered breathing.  The plaintiff also had an echocardiogram that showed an ejection fraction of 60-70% with mild concentric left ventricular hypertrophy and diastolic dysfunction.  The plaintiff reported tightness in her chest radiating to her left arm and occasional nausea with occasional diarrhea.  Mr. Kyer adjusted the plaintiff's medications and ordered additional testing (Tr. 270).

On April 13, 2010, John Labs, a physician's assistant at Pain Specialists of the Carolinas, evaluated the plaintiff for follow-up of chronic pain.  The plaintiff reported severe abdomen pain worsened by bending over, sitting, and standing.  She also reported numbness, tingling, and weakness in her left arm.  The plaintiff indicated that she had a swollen feeling behind her shoulders and along her back.  Mr. Labs noted that the plaintiff had already had three injections and had been using home oxygen.  Mr. Labs found right upper quadrant and epigastric tenderness and mild tenderness to palpation.  Mr. Labs

diagnosed chronic pancreatitis and chronic pain syndrome. He advised the plaintiff to call to schedule another Celiac block when she was ready and continued her numerous medications (Tr. 250-53).

On April 20, 2010, Dr. Schmitz evaluated the plaintiff for continued problems with constipation, abdominal pain, and bloating. She also reported some difficulty with diarrhea. Dr. Schmitz noted that the plaintiff was confused about her medications and the reason she was taking them. The plaintiff reported having rectal bleeding over several weeks. Dr. Schmitz indicated that the plaintiff was on methadone for chronic pain and was set to have a series of epidural injections. Dr. Schmitz reviewed and adjusted the plaintiff's medications. On examination he found diffuse abdominal tenderness with abdominal distention due to bloating. He ordered blood work and a colonoscopy (Tr. 915-17).

On May 11, 2010, Mr. Labs evaluated the plaintiff for follow-up of chronic pain syndrome and chronic pancreatitis. The plaintiff reported sharp, worsening abdominal and flank pain. She rated her pain at eight to ten out of ten. The plaintiff also reported problems with numbness, tingling, weakness, swelling, and bowel changes. Mr. Labs scheduled another celiac plexus block and advised the plaintiff to follow-up with her GI doctor (Tr. 248-49).

On June 9, 2010, the plaintiff underwent cystoscopy with right retrograde pyelogram, right ureteroscopy, and stent placement (Tr. 462-78).

On June 12, 2010, the plaintiff was treated in the emergency room for right flank pain. The plaintiff was diagnosed with acute renal colic and prescribed Percocet (Tr. 454-61).

On June 14, 2010, Dr. Denenberg evaluated the plaintiff for continued significant shortness of breath with exertion. The plaintiff reported only being able to walk short distances and having chest tightness. Dr. Denenberg noted various testing that had been done and indicated that the plaintiff seemed to have some very mild cardiac limitation

11

and some respiratory limitation.  Dr. Denenberg indicated that the etiology of the plaintiff's symptoms remained unclear and that she did appear to have asthma and could have diaphragmatic dysfunction related to possible lupus (Tr. 269).

On June 15, 2010, the plaintiff was treated in the emergency room for progressively worsening right-sided abdominal pain.  It was noted that she had a stent placed the week prior, but could no longer tolerate her pain.  She was given pain medications and advised to follow-up with her urologist (Tr. 482-88).

On June 22, 2010, Dr. Schmitz evaluated the plaintiff for chronic dyspepsia, history of lupus, remote history of pancreatitis, and narcotic induced constipation. The plaintiff reported increased narcotic usage due to nephrolithiasis and recent ureter stenting. Dr. Schmitz noted that the plaintiff continued to take GI medications, had recently been restarted on prednisone therapy for lupus, and was already taking methadone for chronic pain.  Dr. Schmitz continued the plaintiff's medications and recommended an attempted narcotic taper (Tr. 908-10).

On June 23, 2010, Mr. Kyer evaluated the plaintiff.  The plaintiff reported not feeling any significant difference in her breathing since being started on new medications. She complained of chest tightness, cramping chest discomfort, congestion with cough, and shortness of breath.  She reported not sleeping well, feeling like she had been running fevers, occasional chills, and nausea.  Mr. Kyer noted that the plaintiff had diminished breath sounds.  He indicated that the etiology of the plaintiff's symptoms were not entirely clear and adjusted the plaintiff's medications (Tr. 268).  On July 6, 2010, Dr. Denenberg evaluated the plaintiff and reviewed her recent diagnostic tests.  The plaintiff reported becoming winded when walking from room to room causing her to only be able to exert herself minimally.  The plaintiff also reported occasional cramping under her left breast, occasional cough, and nausea. Dr. Denenberg noted that the plaintiff was able to ambulate a long distance in his office but that she did appear to have mild obstructive lung disease

and evidence of old granulomatous disease.  He continued her on some accord and ProAir as needed (Tr. 267).

On July 26, 2010, Dr. Schmitz evaluated the plaintiff for complaints of abdominal pain.  The plaintiff reported some improvement in her symptoms.  Dr. Schmitz continued the plaintiff's medications and started her on MiraLax for constipation (Tr. 905-07).

On August 5, 2010, Dr. Denenberg evaluated the plaintiff for chronic chest pain.  The plaintiff had diminished bilateral breath sounds but no crackles, wheezing, or rhonchi.  Dr. Denenberg indicated that the plaintiff appeared to have asthma, and he started her on Asmanex (Tr. 266).

On August 30, 2010, Dr. Schmitz reevaluated the plaintiff for recurrent dyspepsia, pancreatitis, and constipation.  He continued the plaintiff's medications and ordered blood work (Tr. 900-02).

On September 9, 2010, the plaintiff was treated in the emergency room for chronic abdominal pain.  She reported that only Lortab and Phenergan will give her some relief.  The plaintiff also reported nausea and mild dysuria.  She had minimal diffuse tenderness to palpation in her abdomen.  The plaintiff was given morphine and Zofran, which improved her pain and nausea (Tr. 445-53).  The plaintiff sought emergency room treatment again for recurrent pancreatitis on September 14, 2010.  She reported three days of epigastric, nonradiating abdominal pain not helped with Phenergan.  She was also out of hydrocodone.  There was mention that her symptoms could be related to her lupus.  After being given morphine, she continued to have minimal tenderness in the epigastric and upper regions of her abdomen.  She was diagnosed with chronic abdominal pain (Tr. 437-44).  The plaintiff was treated conservatively and discharged in stable and satisfactory condition (Tr. 437-38).

On September 15, 2010, Dr. Schmitz evaluated the plaintiff for recurrent pancreatitis, dyspepsia, nausea, and vomiting. He noted that she had been hospitalized the month prior with emergency room visits thereafter. The plaintiff had remained on Darvocet for pain. Dr. Schmitz noted the plaintiff's history of lupus being managed with steroids. Dr. Schmitz recommended continued medications, including Darvocet and omeprazole, and a full liquid diet. He suggested that the plaintiff return to the Medical University of South Carolina ("MUSC") for evaluation and to explore treatment options (Tr. 896-98).

On September 26, 2010, the plaintiff was treated in the emergency room for bruising. She was noted to have lupus and to have problems with lupus arthritis and pain in her right hip and right knee. The plaintiff noticed a bruise on her left leg and was concerned about bleeding issues. The plaintiff appeared to be in mild to moderate distress. She was diagnosed with lupus exacerbation and advised to contact her rheumatologist the following day. She was given prescriptions for Lortab and prednisone (Tr. 428-36).

On October 5, 2010, John J. Brendese, M.D., of Ballantyne Rheumatology, evaluated the plaintiff for follow-up. The plaintiff complained of bruising on her legs and right hip pain. The plaintiff's review of systems was positive for weight changes, fatigue, urinary problems, memory loss, syncope, diplopia, dizziness, and vertigo. Dr. Brendese diagnosed undifferentiated connective tissue disease ("UCTD"), body aches, anemia, and vitamin D deficiency. He refilled the plaintiff's medications and continued her prednisone taper. He advised follow-up for her insomnia and anemia (Tr. 1004-06).

The plaintiff was hospitalized from October 18-22, 2010, for chest pains. Cardiac workup was negative. The plaintiff was diagnosed with chest pain, non-cardiac in origin, systemic lupus erythematosus, chronic pancreatitis likely lupus in nature secondary to lupus, history of urethral stent placements, and status post cholecystectomy. She was

advised to seek follow-up treatment and to continue her current medications, including Lortab, prednisone, trazodone, Darvocet, and oxygen (Tr. 380-427).

On October 26, 2010, Mr. Kyler evaluated the plaintiff for follow-up.  The plaintiff reported recent cardiac work-up due to chest pain and shortness of breath.  Mr. Kyer indicated that it did appear that the plaintiff had asthma.  He recommended continued use of Symbicort and restarted the plaintiff on Spiriva (Tr. 265).

On October 28, 2010, Taral N. Patel, M.D., a cardiologist, evaluated the plaintiff for continued chest pain radiating to her left arm, shoulder, and back.  Dr. Patel reviewed the plaintiff's cardiology test results and indicated that her symptoms appeared to be musculoskeletal chest wall pain.  Dr. Patel suggested continued treatment for hypertension that was adequately controlled and prescribed Plavix (Tr. 946-47).

The plaintiff sought emergency room treatment for abdominal pain on November 1, 2010.  She left prior to full disposition (Tr. 377-79).  The plaintiff returned the following day for "knots" in her stomach that developed after she had received shots for a possible blood clot two weeks prior.  She also reported some mild epigastric pain, nausea, intermittent chest pain, and some chronic back pain.  The emergency room doctor found no evidence of masses or infection and suspected that the plaintiff was having epigastric pain secondary to chronic gastritis and reflux disease (Tr. 369-76).

On November 30, 2010, Dr. Schmitz evaluated the plaintiff for a follow-up of abdominal pain.  Dr. Schmitz noted that the plaintiff was taking narcotic medications and prednisone daily.  Following examination, Dr. Schmitz diagnosed recurrent pancreatitis, non-ulcerative dyspepsia, family history of colon cancer, and lupus.  He ordered updated diagnostic tests, restarted the plaintiff on pancreatic enzyme replacements, and continued her other treatment (Tr 856-58).

On December 13, 2010, Dr. Brendese reevaluated the plaintiff for chronic pain and review of her extensive medication list, which included:  omeprazole, prednisone,

15

amlodipine, promethazine, Miralax, hydrocodone, Plaquenil, Norvasc, potassium chloride, Symbicort, trazodone, insulin, Novolog, Colace, Senna, Zofran, and Lortab. Dr. Brendese indicated that the plaintiff's review of systems was positive for numerous problems including weight changes and fatigue. He continued the plaintiff's Plaquenil and prednisone taper for her UCTD and started her on a trial of Savella (Tr. 1007-09).

On December 22, 2010, Todd M. Cohen, M.D., of Piedmont Urology, evaluated the plaintiff for follow-up of a history of microscopic hematuria, recurrent infections, and low back pain. The plaintiff reported continued low back pain radiating down her right leg as well as decreased urination and some blood with voiding. The plaintiff's review of systems was positive for some generalized fatigue. Dr. Cohen diagnosed oliguria, low back pain, and history of urinary tract infections. Dr. Cohen sent out a urine culture and adjusted the plaintiff's medications (Tr. 968-69).

On January 13, 2011, Dr. Schmitz evaluated the plaintiff for complaints of abdomen pain and nausea. Following an examination, Dr. Schmitz diagnosed progressive dyspepsia, chronic pancreatitis and abdominal pain, hypertension, and lupus. He recommended hospital admission (Tr. 888-90).

The plaintiff was hospitalized from January 13-18, 2011, for an evaluation of recurrent abdominal pain, chronic pancreatitis, and constipation. She was treated with IV fluids, a clear liquid diet, and intravenous Dilaudid for pain. She was discharged with a prescription for Lortab and advised to continue her medications and follow-up with pain management (Tr. 346-65).

On February 3, 2011, Dr. Patel evaluated the plaintiff for complaints of substernal chest pain. Dr. Patel indicated that the plaintiff's symptoms were stable, atypical, and decidedly non-cardiac. Dr. Patel reviewed the plaintiff's medication changes and continued her current treatment (Tr. 948-49).

16

On February 9, 2011, the plaintiff was initially evaluated at MUSC for chronic relapsing pancreatitis. It was noted that she had undergone several celiac plexus blocks without great benefit. She was referred to Katherine Morgan, M.D., of MUSC for evaluation (Tr. 803-07). On this same date, Dr. Morgan evaluated the plaintiff for a surgical evaluation of a total pancreatectomy with auto islet transplant. Dr. Morgan noted that the plaintiff had been first diagnosed with pancreatitis in the 1990s. Despite various treatments, the plaintiff reported continued, worsening abdominal pain requiring increased doses of narcotic pain medications and hospitalizations. The plaintiff rated her pain between five-six and eight out of ten. Dr. Morgan noted that the plaintiff was hard of hearing and had other problems such as asthma, painful urination, joint and back pain, anemia, and easy bruising. Dr. Morgan elicited the plaintiff's history and reviewed her blood work results. She discussed surgical options (Tr. 797-802). An abdominal ultrasound and an MRI showed evidence of prior gallbladder surgery, but were otherwise negative (Tr. 819).

On February 10, 2011, the plaintiff underwent an endoscopic retrograde cholangiopancreatography ("ERCP") for constant, severe abdominal pain (Tr. 829-30).

On February 21, 2011, the plaintiff was seen in the emergency room for an acute skin ulceration (Tr. 316-19).

On February 22, 2011, Dr. Schmitz evaluated the plaintiff for follow-up of chronic pancreatitis and reviewed her ERCP results. He indicated that in light of the plaintiff's chronic pain issues and frequent hospitalizations, pancreatic resection would be a viable option even though she would develop associated diabetes and pancreatic insufficiency (Tr. 882-84).

On February 25, 2011, Dr. Denenberg evaluated the plaintiff and noted a slight worsening in symptoms since running out of some of her medications. Dr. Denenberg indicated that the plaintiff had no absolute pulmonary contraindications for pancreatectomy surgery (Tr. 264).

17

On March 16, 2011, Dr. Morgan evaluated the plaintiff's intractable pain and nausea that was unresponsive to treatment. It was noted that the plaintiff had multiple hospitalizations and was taking narcotic medication daily. Dr. Morgan discussed surgery and indicated that they would start the approval process (Tr. 794-96).

The plaintiff sought emergency room treatment for abdominal (epigastric) pain and vomiting on April 26, 2011. Her laboratory findings were normal. A CT scan of her pancreas showed mild to moderately distended descending duodenum with rapid tapering at the midline, raising possibility of SMA syndrome. She did well with pain medication and was advised to follow up with her gastroenterologist (Tr. 323-35).

On April 27, 2011, Dr. Schmitz evaluated the plaintiff for follow-up of chronic pancreatitis and chronic nausea and vomiting. The plaintiff reported that she was going to have surgery but could not explain what her surgery was for. The plaintiff reported continued vomiting despite Zofran. Dr. Schmitz ordered the plaintiff's emergency room records and refilled her prescription for Zofran (Tr. 879-81).

On May 14, 2011, Dr. Rodrigue evaluated the plaintiff for diffuse abdominal pains. He noted that she was scheduled to have surgery (Tr. 1407-08).

On May 18, 2011, the plaintiff was evaluated at MUSC for epigastric pain radiating to her right upper quadrant and back. She also reported diarrhea and weight loss. It was noted that she was cleared for surgery by Dr. Denenberg and was advised of the likelihood of developing diabetes following surgery (Tr. 789-93).

On May 24, 2011, Dr. Brendese evaluated the plaintiff for lower back and right upper quadrant pain. The plaintiff also reported a dull achy sensation with occasional sharp pains and parasthesias, muscle spasms, headaches, and right ankle swelling. Dr. Brendese noted that the plaintiff was scheduled to have pancreatic surgery. The plaintiff's review of systems was positive for weight changes, fatigue, shortness of breath, problems with urination or incontinence, memory loss, anxiety, and depression. Dr. Brendese noted

that the plaintiff had been compliant with treatment and continued her current treatment regimen (Tr. 1024-31).

On May 31, 2011, Dr. Cohen evaluated the plaintiff for worsening problems voiding. The plaintiff reported having to wear two to three pads per day. She reported getting up twice in the night to urinate and having problems getting her urine stream started. Dr. Cohen refilled the plaintiff's prescription for Vesicare (Tr. 970-72).

On June 14, 2011, Paul Slota, M.D., another physician in Dr. Patel's office, evaluated the plaintiff for aching and sharp chest pain radiating to her left arm. Following examination, he ordered cardiac testing and discontinued the plaintiff's Plavix and Savella (Tr. 950-51). Also on this date, Dr. Nami, another physician in Dr. Brendese's practice, evaluated the plaintiff for low back and right quadrant pain with some parasthesias, muscle spasms, and headaches. The plaintiff reported that her pain was worsened with bending or turning her head. The plaintiff also reported swelling in her right ankle. Dr. Nami found trapezoid muscle tenderness bilaterally and tenderness in the plaintiff's cervical spine, lumbar spine, shoulders, elbows, hands, and hips. The plaintiff also had tenderness and crepitus in her knees, right ankle tenderness and swelling, and left ankle tenderness. The plaintiff's strength was 5/5, and her sensation was intact. Dr. Nami's diagnoses included UCTD, pancreatitis, anemia, and vitamin D deficiency. Dr. Nami noted that the plaintiff was scheduled to undergo pancreatic surgery the following week (Tr. 1000-03).

A June 17, 2011, echocardiogram report showed normal left ventricular functioning with an ejection fraction above 60% and mild pulmonary insufficiency (Tr. 842-43). The plaintiff was treated for hypertension, which her cardiologist considered to be benign, stable, and adequately controlled with medication (Tr. 946-54).

On June 23, 2011, Jeffrey J. Borckardt, Ph.D., of MUSC, evaluated the plaintiff for surgical clearance. The plaintiff's history was notable for recurrent pancreatitis with dilated pancreatic duct, lupus maintained on prednisone daily, dyspepsia,

hypertension, interstitial lung disease secondary to lupus maintained on 3L oxygen at night, insomnia, gastroparesis, and irritable bowel syndrome. The plaintiff reported mood swings and disturbed sleep. Dr. Borckardt diagnosed depressive disorder NOS; anxiety disorder NOS, pain disorder associated with both a general medical condition and psychological factors, pancreatitis, lupus, dyspepsia, hypertension, chronic pain, and a Global Assessment of Functioning ("GAF")[1] score of 65. Dr. Borckardt indicated that if the plaintiff could maintain her current level of functioning, she could be considered a moderate to fair candidate for pancreatectomy from a psychosocial perspective. He stated, "Given her tendency to experience depressive symptoms in response to stressful life events, it will be essential for the patient and her medical team to monitor her mood for signs and symptoms of a depressive episode" (Tr. 778-82). The plaintiff reported regular mood swings and a history of panic disorder for which she had taken antidepressant medication. She reported no anxiety in eleven years and no history of psychotherapy or psychiatric hospitalizations (Tr. 780). A mental status examination revealed normal mood and affect, intact cognition, and no evidence of impaired judgment or insight (Tr. 779). She was cleared for surgery (Tr. 782).

The plaintiff was hospitalized from June 23- July 3, 2011, for surgery to remove her pancreas (a pancreatectomy) with autologous islet cell transplant (Tr. 785-88, 823-28). She recovered well after surgery, and her nausea improved. Her average pain was tolerable, and she no longer took long-acting pain medication (Tr. 770-77).

---

[1]A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning." *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (Text Revision 4th ed. 2000) ("*DSM-IV*"). A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well. *Id.* The court notes that the fifth edition of the DSM, published in 2013, has discontinued use of the GAF for several reasons, including "its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice." *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 16 (5th ed. 2013) ("*DSM–V*").

Post-surgery records show that the plaintiff's mood and affect were normal, and her memory, judgment, and insight were intact (Tr. 771, 775).

On July 12, 2011, Dr. Cohen evaluated the plaintiff for complaints of a urinary tract infection for one month's time. The plaintiff reported frequent daytime urination and having problems with urgency where she occasionally does not make it to the bathroom in time. Dr. Cohen sent a urine culture for testing and prescribed antibiotics (Tr. 973-76).

On July 19, 2011, Mr. Kyer evaluated the plaintiff. He noted that she continued to use Symbicort and Spiriva daily and that she had just undergone a pancreatectomy the month prior. The plaintiff reported that she continued to feel quite weak after surgery and was having dyspnea on exertion. Mr. Kyer indicated that the plaintiff was using oxygen during the day and at night. The plaintiff reported feeling tired when she awakens and having afternoon somnolence. She reported taking occasional afternoon naps. Mr. Kyer indicated that the plaintiff's asthma seemed to be stable, and he continued her medications. He also ordered diagnostic studies for symptoms of sleep apnea (Tr. 263).

On July 20, 2011, Dr. Morgan evaluated the plaintiff for surgical follow-up. The plaintiff reported that her pain had been better and her nausea was stable. Dr. Morgan noted that the plaintiff was using Lortab and taking pancreatic enzymes, but not using her proton pump inhibitor as prescribed. Dr. Morgan prescribed Nexium and continued the plaintiff's current regimen (Tr. 774-77). The plaintiff developed diabetes after the removal of her pancreas, as her doctors had cautioned would be a likely consequence of surgery (Tr. 789). She began treatment with insulin (Tr. 774-77).

On July 26, 2011, Dr. Cohen evaluated the plaintiff for continued urinary urgency. Dr. Cohen noted that the plaintiff had been treated for a urinary tract infection while in the hospital undergoing surgery. She had initially responded to treatment but was having recurrent infections. The plaintiff's review of systems was positive for weight loss,

abdominal pain, diarrhea, and nausea.  Dr. Cohen advised continued medications (Tr. 977-80).

On August 23, 2011, Dr. Cohen evaluated the plaintiff for continued urinary urgency.  The plaintiff reported that her symptoms had improved somewhat.  The plaintiff's review of systems was also positive for weight loss, hearing loss, shortness of breath, diarrhea, and chronic back pain.  Dr. Cohen continued the plaintiff's medications and indicated that they would consider repeat diagnostic testing if symptoms did not improve (Tr. 981-84).

On August 26, 2011, Dr. Schmitz evaluated the plaintiff.  The plaintiff reported post-surgical diarrhea despite her adjusted medications.  She had gained approximately seven pounds.  Dr. Schmitz adjusted the plaintiff's dose of Zenpep and continued her other medications (Tr. 873-76).

On August 30, 2011, the plaintiff told Dr. Denenberg that her asthma was doing well, and she denied any significant wheezing or tightness in her chest.  A polysomnogram was normal (Tr. 262, 275).  A chest examination also was normal, and Dr. Denenberg concluded that the plaintiff's asthma was stable.  The plaintiff reported continued difficulty sleeping at night, but Dr. Denenberg noted that her sleep study did not show obstructive sleep apnea.  He indicated that her symptoms could be related to her medications (Tr. 262).  Pulmonary function tests in 2010 and 2011 showed mild to moderate obstructive defect, improved from earlier studies (Tr. 277, 292, 311).

The plaintiff was treated in the emergency room for intermittent, sharp chest pain on September 1, 2011.  An EKG was normal, and a chest x-ray showed no evidence of cardiopulmonary disease.  The plaintiff also had some chills, some diarrhea, and mild nausea.  She was discharged with instructions to seek follow-up care (Tr. 336-45).

On September 27, 2011, Dr. Cohen evaluated the plaintiff for frequent urination and incontinence.  The plaintiff also reported weight loss, nausea, vomiting, and chronic back pain.  Dr. Cohen added Mobic to the plaintiff's medications (Tr. 985-88).

On October 12, 2011, Dr. Morgan reevaluated the plaintiff for pancreatectomy follow-up.  The plaintiff reported that her pain scale over the prior month had been tolerable and that she was taking one Lortab a day.  The plaintiff also reported that her nausea was better and that she had weight loss.  Dr. Morgan advised continued omeprazole and increased pancreatic enzymes (Tr. 770-73).

On October 27, 2011, Dr. Schmitz evaluated the plaintiff.  He noted that she originally had done well following pancreatectomy but had noticed over several weeks a progression of loose stools, diarrhea, and weight loss despite current medications.  The plaintiff estimated that she had lost approximately 20 pounds since her surgery.  Dr. Schmitz adjusted the plaintiff's medications (Tr. 870-72).  On December 15, 2011, Dr. Schmitz noted that the plaintiff had undergone a 48 hour stool collection with elevated fecal fat.  Dr. Schmitz provided the plaintiff with samples of medication and discussed diet.  He also continued her omeprazole and pancreatic enzyme replacement (Tr. 1059-61).

During a visit to her family doctor on January 4, 2012, she reported intermittent pain in her neck and shoulders for the past three weeks, but an examination showed no skeletal tenderness or deformity (Tr. 1080)

During a consultative examination by Sushil K. Das, M.D., on January 16, 2012, the plaintiff's lungs were clear with 99% oxygen saturation (Tr. 963-66).  The plaintiff complained of arthritis in her left hip, which hurt "badly" and had first appeared one year earlier.  It worsened when the weather was cloudy but improved with pain medication.  The plaintiff also reported tendinitis in her left shoulder with pain in her left arm (Tr. 963).  An examination showed no chest pain or shortness of breath, a normal chest examination, regular heart rate and rhythm, no tenderness or free fluid in the abdomen, no edema of the

23

extremities, a grossly intact neurological examination with full (5/5) muscle power in the upper and lower extremities, and the ability to climb up on and down off the examining table, and walk, without difficulty (Tr. 964). X-rays of the left shoulder and left hip were normal (Tr. 959). The plaintiff reported that she could stand for fifteen minutes, sit for five minutes (Dr. Das noted that she had been sitting for a long time), move around for five minutes, lift up to ten pounds, and carry and handle ten to fifteen pounds, although Dr. Das concluded that she was able to do "a lot more than that." The plaintiff also reported that she was able to carry out her activities of daily living. She was five feet nine inches tall and weighed 134.4 pounds. Range of motion of her cervical and lumbar spines and all extremities was normal, and the plaintiff had normal gait, normal sensory and motor reflexes, and no muscle weakness, spasm, or atrophy. Dr. Das saw no problem with the plaintiff's left hip and noted that she had full range of motion and no joint abnormalities (Tr. 964). Dr. Das concluded that he did not see any significant problem for the plaintiff, and that she had some vague complaint of arthritis in her left hip and tendinitis in her shoulder, but she would be able to do normal physical activity (Tr. 965). Her abdomen was soft with no tenderness at the this consultative examination (Tr. 963-66).

The plaintiff continued to undergo treatment for intermittent gastrointestinal problems after her date last insured (Tr. 1197-1218, 1219-51, 1387-1427, 1428-44).

On February 23, 2012, a non-examining consultant on contract to the Administration completed a Physical Residual Functional Capacity ("RFC") Assessment indicating that the plaintiff was capable of performing light work with some postural and environmental limitations (Tr. 64-66).

A Psychiatric Review Technique Questionnaire form and Mental RFC Assessment were completed by a non-examining consultant on contract to the Administration, also on February 23, 2012, indicating that the plaintiff had medically determinable mental impairments causing mild restriction of daily activities, mild difficulty

in maintaining social functioning, moderate difficulty in maintaining concentration, persistence, and pace, and no episodes of decompensation (Tr. 61-62, 66-67).

On March 6, 2012, the plaintiff reported fluctuating blood sugar levels post-pancreatectomy and a recent incident of hypoglycemia (Tr. 1073-75). She was advised not to take insulin unless her blood sugar level was over 200 (Tr. 1075). When she returned later that month, she reported that her blood sugar levels had been between 80 and 158 and she had no further hypoglycemia (Tr. 1070-72). She was diagnosed with diabetes mellitus without mention of complication and advised to continue to monitor her blood sugar levels and take insulin (Tr. 1068-92).

Her gastroenterologist, Robert Schmitz, M.D., noted on March 8, 2012, that the plaintiff's lupus symptoms were managed with Plaquenil and low-dose steroid therapy (Tr. 1146). Also on that date, the plaintiff described persistent weight gain and denied any further weight loss (Tr. 1047, 1146). The plaintiff indicated her symptoms were managed with medication (Tr. 1146). After a period of not having taken her insulin for a month, her insulin regimen was adjusted and, by 2012, her blood sugar levels were well controlled (Tr. 1155-61, 1163-73).

An echocardiogram on April 9, 2012, showed normal ventricular functioning with mild mitral regurgitation and mild to moderate tricuspid regurgitation (Tr. 1253).

On June 12, 2012, a non-examining consultant on contract to the Administration completed a Physical RFC Assessment indicating that the plaintiff was capable of performing light work with some postural and environmental limitations (Tr. 85-87). On that same date, a Psychiatric Review Technique Questionnaire form was completed by a non-examining consultant on contract to the Administration, indicating that there was insufficient evidence to rate the limitations from the plaintiff's medically determinable mental impairments (Tr. 82-83).

On December 14, 2012, the plaintiff told her rheumatologist Dr. Jane Box that she began to have problems one year earlier, mainly in her shoulders, low back, and hands (Tr. 1452). The plaintiff developed Raynaud's phenomenon after the relevant period of her claim (Tr. 1183-96, 1445-50, 1528). On May 9, 2013, Dr. Denenberg noted that the plaintiff's rheumatologist recently took her off steroid medication for lupus (Tr. 1362).

The plaintiff stopped working on March 15, 2007 (Tr. 32, 187). She reported that she was laid off from her job (Tr. 182). Her employer reported that she resigned (Tr. 210).

Aaron Stevenson, the plaintiff's husband, submitted a third party report in support of her application for benefits. Mr. Stevenson indicated that the plaintiff had no difficulty with personal care and was able to prepare light meals for dinner several times per week (Tr. 202, 203). He reported that the plaintiff cleaned, washed laundry, ironed, washed dishes, and used a vacuum cleaner (Tr. 203). The plaintiff went outside four to five days per week and shopped in stores weekly for groceries or personal items (Tr. 204). The plaintiff liked to read, watch television or movies, and complete word search puzzles, all of which she did daily and, Mr. Stevenson explained, did well because they did not require physical activity. The plaintiff also spent time with others, went out for dinner, and attended church regularly (Tr. 205). According to Mr. Stevenson, due to the fact that she was sick more often than she was not, the plaintiff was not always able to attend social events as she had before her illnesses began (Tr. 206).

During the hearing, the ALJ asked the vocational expert to consider an individual of the plaintiff's age, education, and work history, who could perform unskilled, sedentary work with simple, routine, repetitive tasks and only frequent (rather than constant) handling and fingering. The vocational expert responded that such an individual could perform the unskilled, sedentary jobs of ink printer, table worker, and circuit board taper, all of which exist in significant numbers in the national economy (Tr. 50).

The plaintiff's attorney asked about the addition of needing four to five, ten minute breaks away from the work station during a work shift, and the vocational expert responded that this would not be allowed. The vocational expert also confirmed that a need for unpredictable absences of two days or more a month would also preclude the ability to maintain employment (Tr. 51)

## **ANALYSIS**

The plaintiff argues that the ALJ erred in determining that her impairments did not meet or equal Listing 14.02(A) (Systemic lupus erythematosus) (doc. 15 at 25-33). The regulations state that upon a showing of a listed impairment of sufficient duration, "we will find you disabled without considering your age, education, and work experience." 20 C.F.R. § 404.1520(d). A step three listing analysis includes identifying the relevant listed impairments and comparing the criteria with the evidence of the plaintiff's symptoms. *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986) (stating that "[w]ithout such an explanation, it is simply impossible to tell whether there was substantial evidence to support the determination").

The regulations addressing systemic lupus erythematosus ("SLE") provide as follows:

14.00 Immune System Disorders

D. *How do we document and evaluate the listed autoimmune disorders?*

1. Systemic lupus erythematosus (14.02).

a. General. Systemic lupus erythematosus (SLE) is a chronic inflammatory disease that can affect any organ or body system. It is frequently, but not always, accompanied by constitutional symptoms or signs (severe fatigue, fever, malaise, involuntary weight loss). Major organ or body system involvement can include: Respiratory (pleuritis, pneumonitis), cardiovascular (endocarditis, myocarditis, pericarditis, vasculitis), renal (glomerulonephritis), hematologic (anemia, leukopenia,

thrombocytopenia), skin (photosensitivity), neurologic (seizures), mental (anxiety, fluctuating cognition, lupus fog, mood disorders, organic brain syndrome, psychosis), or immune system disorders (inflammatory arthritis). Immunologically, there is an array of circulating serum auto-antibodies and pro- and anti-coagulant proteins that may occur in a highly variable pattern.

b. Documentation of SLE. Generally, but not always, the medical evidence will show that your SLE satisfied the criteria in the current "Criteria for the Classification of Systemic Lupus Erythematosus" by the American College of Rheumatology found in the most recent edition of the Primer on the Rheumatic Diseases published by the Arthritis Foundation.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.00(D)(1).

The relevant portion of Listing 14.02 requires the following:

14.02 Systemic lupus erythematosus. As described in 14.00D1. With:

A. Involvement of two or more organs/body systems, with:

1. One of the organs/body systems involved to at least a moderate level of severity; and

2. At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise or involuntary weight loss). . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.02(A).

The ALJ found as follows:

Her physical impairments did not manifest the signs, symptoms, and findings required to meet or medically equal Listing 5.08 14.02, 14.06, or any of the other listings in 20 C.F.R. Part 404, Appendix 1 to Subpart P. This finding is consistent with that of the State agency medical consultants who found that no listing was met or equaled, and no medical evidence has been submitted at the hearing level which would alter that conclusion. As discussed above, her lupus was generally stable on medication during the period in question. Her pancreatitis worsened shortly before her surgery in June 2011 but improved afterwards. She lost weight in 2011 but her condition stabilized.

(Tr. 18).

The plaintiff argues that she clearly had involvement of two or more organs/body systems as she has pancreatitis, depressive disorder with anxiety, asthma, diabetes, arthritis, and cardiac problems, all of which the ALJ himself acknowledged (Tr. 15-17). The record evidence shows that lupus was involved in her pancreatitis (Tr. 380), her interstitial lung disease (Tr. 264, 351, 785, 799, 801), and arthritis (Tr. 428). Furthermore, as the plaintiff argues, her pancreatitis would be considered "involved to at least a moderate level of severity" since it required surgery and continued, consistent treatment. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.02(A)(1). The undersigned agrees.

The Commissioner does not argue that the plaintiff cannot meet Listing 14.02(A)(1). Rather, the Commissioner argues (doc. 16 at 15-16) that the plaintiff cannot meet the second subsection of Section A requiring "[a]t least two of the constitutional symptoms or signs (severe fatigue, fever, malaise or involuntary weight loss)." *Id*. § 14.02(A)(2). First, the Commissioner concedes that the plaintiff's rheumatologist "noted fatigue on several occasions between October 2010 and April 2011" but states "he did not assess Plaintiff with severe fatigue and noted, somewhat to the contrary, that she was in no acute distress (doc. 16 at 16 (citing Tr. 1001-19)). Notably, the ALJ never explicitly analyzed and found that the plaintiff's fatigue did not meet the listing requirement of "severe fatigue," so this *post-hoc* rationale. *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir.2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ."). Further, the Commissioner has provided no authority showing that severe fatigue requires a finding of acute distress. The listing does not require a specific diagnosis of "severe fatigue," but rather requires evidence of severe fatigue "as the medical community would consider severe." *See* 20 C.F.R. Pt. 404, Subpt. P, § 14.00(C)(12) (defining severe as "medical severity as used by the medical community"). The record shows numerous

complaints of fatigue (Tr. 968, 1005, 1008, 1011, 1014, 1016, 1017, 1025, 1032) to Dr. Brendese from October 2010 to February 2012.  Further, the record shows several instances of complaints of fatigue that would appear to be considered severe. For example on April 26, 2011, Dr. Brendese noted that the plaintiff complained of "fatigue, which is constant, which they rate 8 out of 10 in severity" (Tr. 1016), and Dr. Box's records document a "fatigue scale" showing one rating of 5, several ratings of 7 and 8, and one rating of 10 (Tr. 1452, 1473, 1480, 1485, 1493, 1499, 1504, 1513, 1518) from December 2012 to June 2013.

The plaintiff also cites (doc. 15 at 28) treatment notes showing fever (Tr. 268, 813, 1127) and involuntary weight loss (Tr. 578, 870, 871, 908, 979, 982, 986, 1005, 1008, 1011, 1014, 1017).  The Commissioner does not address the fever issue but argues with regard to weight loss:

> [A]lthough Plaintiff had initial weight loss prior to surgery in 2011, treatment records show that her weight loss ceased following surgery and, by March 2012, she reported "persistent weight gain" and denied any further weight loss (Tr. 1146). In addition, even at a maximum weight loss over several years of approximately forty pounds, from 182 to 141, Plaintiff's doctors consistently assessed her as well-nourished and in no acute distress (Tr. 1004-41).

(Doc. 16 at 16).   The Commissioner further argues, "[S]urgical removal of Plaintiff's pancreas in June 2011 resulted in improved nausea, pain that was tolerable, and no more weight loss" (doc. 16 at 17 (citing Tr. 770-77)).  In his listing finding at step three, the ALJ stated, "Her pancreatitis worsened shortly before her surgery in June 2011 but improved afterwards.  She lost weight in 2011 but her condition stabilized" (Tr. 18).  However, the record shows that on October 27, 2011, four months after the surgery, Dr. Schmitz reevaluated the plaintiff and noted that, although she originally had done well following pancreatectomy, she had noticed over several weeks a progression of loose stools, diarrhea, and weight loss despite current medications.  The plaintiff estimated that she had

30

lost approximately 20 pounds[2] since her surgery (Tr. 870-72).  Further, with regard to the Commissioner's argument that the plaintiff denied further weight loss after March 2012, when she weighed 141 pounds (Tr. 1147), the record shows continued complaints of weight loss outside of the relevant period in May 2012, at which time she weighed 135 pounds (Tr. 1288), and September 2012 (Tr. 1295).

In support of his step three finding, the ALJ indicated that he relied on the findings of the State agency medical consultants "who found that no listing was met or equaled, and no medical evidence has been submitted at the hearing level which would alter that conclusion" (Tr. 18). While the ALJ may rely on the opinion of a State agency medical consultant in conducting a listing analysis, 20 C.F.R. § 404.1527(e)(2)(iii), the ALJ ultimately bears the responsibility for deciding whether a claimant's impairments meet or equal a listing. *Id*. at § 404.1527(d)(2). A signed Form SSA–831 may satisfy the requirement of receiving expert opinion evidence into the record. SSR 96–6p, 1996 WL 374180, at *3 (the signature of a state agency medical consultant on form SSA–831 ensures that consideration by a physician designated by the Commissioner has been given to the question of medical equivalence). Here, the record includes Disability Determination and Transmittal Forms (Form SSA-831) signed by Cleve Hutson, M.D. (Tr. 71) and Matthew Fox, M.D. (Tr. 90).  However, it does not appear that the State agency medical consultants specifically considered Listing 14.02 (*see* Tr. 63, 84), and they both found the plaintiff's SLE to be non-severe (Tr. 61, 82), a conclusion the ALJ did not follow (Tr. 14).  Also, in the RFC analysis, the ALJ noted that both Drs. Hutson and Fox concluded that the plaintiff could perform light work, a finding that the ALJ rejected "[b]ased on  testimony and additional evidence" (Tr. 21-22).  Furthermore, as noted above, the ultimate decision on whether a claimant meets or equals a listing is a matter reserved to the ALJ. Here, the ALJ's listing

---

[2]On June 14, 2011, a week before her surgery, the plaintiff weighed 163 pounds (Tr. 951).

analysis was limited to a broad statement that the plaintiff's lupus was "generally stable on medication," that her pancreatitis improved after surgery, and that her weight loss stabilized (Tr. 18).  With regard to the ALJ's statement that the plaintiff's lupus was "generally stable on medication," as argued by the plaintiff, unquantified notations of stability are not contradictory to her allegations and are insufficient to support a summary rejection of the listing analysis.  The record shows that the plaintiff suffered from chronic pain and attacks on her other body systems from lupus, as discussed above.  Further, her symptoms remained severe enough to warrant the continued prescription of strong narcotic pain medications such as methadone, oxycodone, Darvocet, and Lortab.  Moreover, as set forth above, the plaintiff has cited evidence showing that the general statements regarding improvement of her pancreatitis and weight loss stabilization after surgery are not completely accurate.  Without the ALJ's analysis, it is impossible to determine whether the finding that the plaintiff's impairments do not meet or medically equal this listing is based upon substantial evidence. A listing analysis includes identifying the relevant listed impairments and comparing the criteria with the evidence of the plaintiffs symptoms. *See Cook*, 783 F.2d at 1173 (stating that "[w]ithout such an explanation, it is simply impossible to tell whether there was substantial evidence to support the determination"). Accordingly, upon remand, the ALJ should be instructed to specifically consider, analyze, and explain whether the plaintiffs impairments meet or equal Listing 14.02(A)[3] by comparing the listing's criteria with the evidence of record.

---

[3]The Commissioner also argues that the plaintiff does not meet or equal Listing 14.02(B) (doc. 16 at 16-17).  However, consideration of this section of the listing is unnecessary as the plaintiff does not claim that she meets Listing 14.02(B) (doc. 17 at 3).

## **CONCLUSION AND RECOMMENDATION**

Now, therefore, based on the foregoing, it is recommended that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and that the case be remanded to the Commissioner for further consideration as discussed above.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

June 11, 2016
Greenville, South Carolina

33